[No. G038343. Fourth Dist., Div. Three. Sept. 18, 2007.]

In re Q.D., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
M.V., Defendant and Appellant.

**COUNSEL**

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Jeannie Sue, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

## Opinion

**BEDSWORTH, Acting P. J.**—M.V. (M.) appeals from a purported order terminating her parental rights to her son Q.D., pursuant to Welfare and Institutions Code section 366.26.[1] She contends she was denied due process, because the court did not conduct a contested hearing on the issue of termination. Although M., through her counsel, expressly waived that right, and agreed to submit the matter on the record, she immediately protested when the court announced its decision to terminate parental rights. She argued that her waiver was invalid and unenforceable due to extrinsic mistake—a confusing similarity between the concepts of adoption and foster care in the Vietnamese language which caused her to misunderstand the nature of the hearing.

Because of the uncertainty regarding M.'s waiver, the court ordered the hearing "trailed" to the next day, expressly for the purpose of allowing the parties to do research on how it should proceed. However, when the matter reconvened, the court concluded that the minute order entered at the end of the prior day had constituted a formal order terminating parental rights, and that it had no power to reconsider or modify that order.

We disagree. The court's minute order for the first day of the hearing was confusing at best—an accurate reflection of what had been a very confused proceeding. But the minute order, like the court's oral statements, concluded with the statement that the hearing was "trailed to 2-9-07 at 8:30 a.m. for (F)(C) [section] 366.26 hrg."; thus, taken as a whole, it cannot be interpreted as the formal order which concluded the hearing.

In light of that fact, there is actually no "order" to appeal from. The section 366.26 hearing was not completed. We consequently dismiss the appeal and remand the matter to the trial court for further proceedings.

\* \* \*

Q.D., then age five, was removed from the custody of his mother, M., in May of 2002, after a report that M. had struck both him and one of his sisters with a stick, leaving welts and bruises. The jurisdictional petition filed by the Orange County Social Services Agency (SSA) alleged that M. was divorced from the children's father, and that his whereabouts were unknown. M. and her husband allegedly had a history of domestic violence, played out in front of the children, placing them at risk of harm. On one occasion during the marriage, M. and the children allegedly fled to a battered women's shelter in

---

[1] All further statutory references are to the Welfare and Institutions Code.

Illinois. M. and her husband also were said to have had a history of physically disciplining the children, placing them at risk of harm.

The petition also alleged M. was aware that Q.D. was physically abused by M.'s boyfriend, but failed to protect him. It was further alleged that M. had a history of allowing her boyfriends to physically discipline the children, which placed them at risk of harm. According to the petition, M. also engaged in altercations with her boyfriend in front of the children, which included the boyfriend throwing objects such as a DVD player, radio and television, which placed the children at risk of physical and emotional harm. In addition, the petition asserted M. had left her children alone all night on numerous occasions while she went out with friends; had "coached" the children to deny their physical abuse when questioned by police officers; and had attempted to hide the stick she used for discipline.

M. was interviewed with the assistance of a Vietnamese interpreter. She denied she was ever legally married to the children's father, and stated they had separated in 1997. She also denied she ever hit her children, except for one recent occasion when she admitted hitting one of her daughters. She provided no explanation for the numerous bruises and scars her children bore, except to suggest they were caused by the children themselves or their friends.

The court subsequently found the allegations of the petition to be true, took jurisdiction over the children and ordered a plan of reunification for M. Although M. did participate in regular visitation during the entire 18-month period of reunification, that effort proved unsuccessful. In connection with the 18-month review hearing, SSA prepared a report which recommended that reunification services be terminated, and that three of the children, including Q.D., be maintained in long-term foster care.[2] As explained in the report, SSA concluded that M. had not made sufficient progress to warrant return of her children to her custody. During the most recent six-month period, she had terminated her individual counseling upon moving to New Mexico, despite the fact the social worker had given her a referral to continue therapy there. She had also stopped her drug and alcohol testing. The report did acknowledge that she "has expressed willingness to resume the children's custody and has maintained a positive relationship with the children by visiting them consistently" but concluded that was insufficient to outweigh the other factors, including her continued unwillingness to take responsibility for her children's physical abuse, or to express any remorse about it.

---

[2] The fourth child, one of Q.D.'s sisters, had requested she be freed for adoption, and SSA recommended that be done.

The report also evaluated each of the children, describing them as being in good health, and developmentally on track. Q.D. was described as "shy, smart and active." It was also noted that the children continued to have difficulty getting along with each other. Although Q.D. and his brother were placed in the same foster home, the brother sometimes provoked Q.D., and they had to be kept separated when they cleaned their room and made their beds. The sisters had been placed in separate foster homes due to their inability to get along with each other. Even so, they continued to have verbal altercations during visitation with M. The children were reported to have bonded appropriately with their foster parents.

The report noted that "it is probable that the children will be adopted, but the children are difficult to place for adoption and there is [no] one willing to accept legal guardianship." It included no evidence suggesting what, if any, efforts were made to investigate the issue of guardianship, and no other information to substantiate the conclusion that guardianship was not an option. Its conclusion was a recommendation that Q.D. and his two siblings continue in long-term foster care and the case be continued for periodic review.

When the hearing recommenced, SSA submitted its reports and all parties waived their rights to cross-examine the preparer of the reports or to offer additional evidence. Although M. argued that based upon SSA's recommendation, Q.D. and two of his siblings should be ordered directly into long-term foster care, without any need for a section 366.26 permanency hearing, the court declined to make such an order. Instead, it ordered reunification services terminated on the basis they had exceeded the 18-month statutory maximum, and referred the matter for a permanency hearing. It also ordered a bonding study done, to evaluate the bonding between each child and M., as well as among the children themselves.

The permanency hearing took place April 29, 2004. SSA stood by its recommendation for long-term foster care, stating that termination of parental rights would be detrimental to Q.D. and his two siblings, all of whom remained bonded with M. The court agreed with SSA's recommendation, and ordered the three children into long-term foster care.

The court thereafter conducted periodic reviews. In October of 2004, SSA reported that Q.D., who engaged in disruptive behaviors, had begun taking prescribed psychotropic medication. In April of 2005, SSA reported that Q.D. had been diagnosed as suffering from attention deficit hyperactivity disorder, and was under the care of a psychiatrist. Despite that treatment and continued

medication, Q.D. still had behavioral problems both at home and school. However, he remained bonded with his siblings, and continued to live in the same home as his brother.

In October of 2005, SSA reported that although Q.D. was characterized as "shy," "sensitive" and "smart," he had also become increasingly aggressive and defiant, and he continued to suffer from attention deficit problems.

In March of 2006, Q.D. (then nine years old) was moved from the foster home he had shared with his brother, into a new foster home where he continues to reside. Q.D.'s new foster parents had originally become acquainted with him as the classmate of their daughter, and through his visits to their home, they developed an attachment and requested he be placed with them. They have expressed a desire to adopt Q.D.

In August of 2006, SSA reported that Q.D. was comfortable with his current placement, and was affectionate with his foster mother. He continued to be described as smart and sensitive, but also as having difficulty following directions, being unable to adapt to a prescribed routine, and engaging in oppositional behavior.

In October of 2006, SSA reported that M. was continuing to experience difficulties, but was receiving assistance from an outreach program to obtain Social Security benefits, housing and mental health treatment. In September of 2006, she had come to the social worker's office to request visitation. At that time, she was told that Q.D.'s foster parents wished to adopt him, and replied that she did not want him to be adopted. M. subsequently had visited with the children, including Q.D., and he expressed a desire to continue visiting with her.

In November of 2006, the court found there was a probability Q.D. would be adopted, although he was characterized as "difficult to place" due to his age and membership in a sibling group. The court noted, however, that Q.D. had a good relationship with his foster parents, and they had expressed their desire to adopt him.

In December of 2006, SSA reported that Q.D. continued to display both positive and negative behaviors. He said that he wanted to be adopted by his foster parents, but at the same time appeared to have difficulty following their directions. Q.D.'s foster parents arranged weekly visits with Q.D.'s two siblings who also remained in foster care, although there had been no contact with Q.D.'s other sister since her adoption was finalized in August of 2005. They expressed a commitment to continuing that visitation into the future.

In the morning of February 8, 2007, the court commenced a section 366.26 hearing to consider termination of parental rights to Q.D. SSA recommended the court terminate M.'s parental rights to Q.D., so that he would be freed for an expected adoption by his current foster parents. M. was present with counsel and a Vietnamese language translator. M.'s counsel submitted on the reports in the court record, and waived cross-examination of the social worker. The court then proceeded to announce its findings and orders, including an order that parental rights be terminated. In response to that order, M. immediately protested: "Why terminate my rights? You cannot do that." "You have no right."

In response to M.'s outburst, the court granted a recess to give her counsel an opportunity to speak with her. The hearing recommenced about 2:30 in the afternoon, and the court announced, "we have had some issues come up that require the lawyers to dig into the books and do a little bit of research as to how we should proceed. That being the case, we need to trail the matter to tomorrow morning at 8:30."

The court's minute order for February 8, 2007, simply recites everything that happened. It reflects that the court announced its orders and findings, and then continued the hearing to allow M.'s counsel to "confer" with her. It next states, "orders and findings pursuant to proposed orders and findings as follows" and recites the full panoply of orders and findings normally associated with the termination of parental rights. It then sets a hearing for May 9, 2007, for "adoption review," and another for "periodic review." However, at the end of the minute order, it also reflects that "issues have arisen that require lawyers to do research[;] this hearing trailed to 2-9-07 at 8:30 a.m. for (F)(C) [section] 366.26 hrg in Dept. L31."

The following day, M.'s counsel filed a motion to set aside the court's findings, and supported it with a declaration explaining that due to the similarity between the concepts of foster care and adoption in the Vietnamese language, M. had misunderstood the purpose of the hearing. According to counsel, all communications between her and M. had been through an interpreter. When counsel conferred with M. prior to the February 8 hearing, she asked for M.'s thoughts regarding Q.D.'s possible adoption by his foster parents. Counsel used the word "adopted" rather than the phrase "termination of parental rights." M. responded that as she had already explained she was "in favor of the adoption," but wanted to be able to continue seeing Q.D. Counsel responded that Q.D.'s foster parents had agreed to participate in a "consortium" visitation agreement if M. wanted that. M. then said she was comfortable with that situation. As a consequence, counsel believed that M. was in agreement with SSA's recommendation.

However, after M.'s outburst following the court's order terminating parental rights, counsel realized there had been a misunderstanding about the meaning of "adoption." Subsequently, two different Vietnamese language interpreters informed counsel that the terms "adoption" and "foster care" are very similar in Vietnamese. M. herself stated that she thought that adoption simply meant that others would raise her child, but that she would retain her parental rights—that she would have the continued right to visit her child, and no one could tell her otherwise. M. insisted that a judge could not tell her she had no parental rights; even if a child is adopted he would still always know who his mother was.

Counsel then stated her own belief that if M. had understood the ramifications of "adoption" under California law, she would have invoked her right to a contested hearing on the issue.

When the court recommenced the trailed hearing, it stated: "[W]e're here today for a further—I don't even know if it's, really, a further contested [section] 366.26 hearing, but I guess that's to be determined after the argument." M. was represented by new counsel, who argued that her waiver of the right to a contested hearing had been based upon a misunderstanding of the nature of the hearing, and it was thus not binding. As a consequence, the court's announced orders based thereon were invalid. Counsel also argued that at the time M. first protested the court's announced decision, the order was not final, and the court had inherent authority to vacate its subsequently entered order in the interests of justice.

Counsel for SSA and Q.D. argued the court had no authority to set aside the prior day's order terminating parental rights, and disputed the assertion that M. did not fully understand what had been at stake. They pointed out that she had previously suffered a termination of her parental rights to another child; that she had originally objected to SSA's recommendation in this case; and she had received numerous advisements in the past that her parental rights might be terminated. They also argued that even if some error had occurred, it was harmless.

The court explained that under the circumstances, it would be inclined to set aside its order, and hold a contested hearing regarding the termination of parental rights. However, the court concluded it was without authority to do so in light of section 366.26, subdivision (i), because its termination order had been entered into the court's minutes. The court explained that had this problem been raised the day before, when its order was not yet final, it would have modified that order and allowed a hearing. Convinced it no longer had that power, it recommended M. petition for a writ. Instead, she appealed.

Section 366.26, subdivision (i)(1) states: "Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the child, upon the parent or parents and upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. *After making the order, the juvenile court shall have no power to set aside, change, or modify it . . .* but nothing in this section shall be construed to limit the right to appeal the order." (Italics added.)

Pursuant to this provision, the trial court determined it had no authority to alter its order terminating M.'s parental rights once that order had been formally entered into the court's minutes on February 8, 2007. However, what the court did not specifically address was whether that order had effectively been entered in the first place. We conclude it had not.

■ As section 366.26, subdivision (i)(1) reflects, the order terminating parental rights must come *at the end* of the hearing. This must be so because when the court makes that order, it has no power to do anything further with respect to the issue. The proceeding is finished. Thus, the court cannot both officially make that order *and* trail the hearing to another day for further consideration.

■ In this case, as reflected in both the court's oral statements *and its minute order*, the section 366.26 hearing did not end on February 8, 2007. Instead, the hearing was trailed for what the minute order characterized as a "366.26 hrg." the next day. That provision for a further section 366.26 hearing the next day is simply incompatible with the conclusion the hearing had already been completed, and the final order entered, on that first day.

When the totality of the February 8, 2007 minute order is considered, it cannot be reasonably construed as a final order terminating M.'s parental rights. Accordingly, we have no choice but to dismiss this appeal and remand the case for further proceedings to complete the "trailed" section 366.26 hearing, including a ruling on whether or not to reopen and allow M. to contest the termination of her parental rights.

The appeal is dismissed, and the case is remanded to the trial court with instructions to proceed with the contested section 366.26 hearing.

Aronson, J., and Fybel, J., concurred.